2020 IL App (1st) 170659-U

No. 1-17-0659

SIXTH DIVISION
October 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Criminal Division. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 20942 |
| | ) | |
| OTHA CALHOUN, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GRIFFIN delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

ORDER

¶ 1    *Held*:    Even if defendant could show that an expert would have formed the opinion based on certain studies that the eyewitness identification testimony of the victim and a bystander was unreliable, his ineffective assistance of counsel claim would nevertheless fail the *Strickland* test.

¶ 2    After a bench trial, defendant Otha Calhoun was found guilty of aggravated battery with a firearm and sentenced to eight years in prison. Defendant appeals, and claims his trial counsel was constitutionally ineffective for failing to call an expert witness to challenge as unreliable the eyewitness identification testimony of the victim and a bystander. We affirm.

¶ 3                                    BACKGROUND

¶ 4     On October 8, 2014, at 3:00 p.m., victim Martese Ross (Ross) watched a fight break out between his sister and other girls from his house on South Hermitage in Chicago. After one of the girls pulled a knife, Ross exited his house and got involved. He removed the knife from one of the girl's hands and the fight stopped. Ross returned to his house with his sister and tended to her arm, which was bleeding from multiple stab wounds. When things calmed down, Ross exited his house to go to the corner store. Before he could close his front door, Ross saw a man in a hoodie with a gun in his hand standing five or six feet away. The man said, "Motherfuckers jumped on my sister," and proceeded to shoot Ross several times in the stomach and the leg. Ross made it into his house and collapsed. He remained in the hospital for several weeks and survived the shooting after surgery.

¶ 5     Ross gave a description of the shooter to a detective at the hospital and later identified defendant as the shooter in a photo array and physical lineup. A bystander who observed the shooting, Marshall Barnes (Barnes), independently identified defendant as the shooter in a photo array and lineup. Defendant was placed under arrest and charged with six counts of attempted first-degree murder (720 ILCS 5/8-4(a) (West 2014)); *id*. § 9-1(a)(1)) and one count of aggravated battery with a firearm (*id*. § 12-3.05(e)(1)). The matter proceeded to a bench trial on January 4, 2017. The State called the following witnesses: Ross, Barnes, and Detective Christopher Tenton of the Chicago Police Department (Detective Tenton).

¶ 6     Ross testified that on October 8, 2014, at 3:00 p.m., he was with his sister at their house on South Hermitage in Chicago. Ross's sister got into an argument with a bunch of girls at an elementary school that was steps away from their house. Ross watched the dispute turn into a

physical altercation. He saw a girl swinging her arms and observed a girl with a knife. Ross testified that he took the knife from the girl's hand and the fight stopped. He and his sister then went back to the house and Ross helped clean her arm, which was bleeding from stab wounds.

¶ 7      When his sister was cleaned up, Ross walked outside to go to the corner store. Before he closed the front door, a man approached him wearing "all black" and a "black hoodie." Ross identified defendant in open court as the man who approached him. Ross indicated that defendant "look[ed] like" the man, but stated that he could not be sure. Ross testified that defendant stood five or six feet away from him during the encounter and that he could see his nose and his mouth, but not his eyes. Ross heard defendant say, "Motherfuckers jumped on my sister" and replied, "Motherfuckers ain't jumped on your sister." Ross saw a gun in defendant's hands and heard six or seven gunshots. Ross was hit in the stomach and the leg and walked into his house where he collapsed. His family called paramedics and Ross was taken to Stroger Hospital, where he stayed for a couple weeks and underwent several surgeries.

¶ 8      Ross spoke with Detective Tenton at the hospital and at his house, on October 23, 2014, when he was released. Ross described the shooter as a "guy with a hoodie on, kind of – I would say I probably a little bit taller than him," and reviewed and signed a photospread advisory form, and viewed a photo array. Ross was unable to identify the shooter. Minutes later, Ross viewed another photo array and positively identified a photograph of defendant as the hooded man who shot him. On October 27, 2014, Ross identified defendant in a physical lineup at the police station. He gave a typewritten statement, viewed a photograph of defendant, and reconfirmed that defendant was the man who shot him. When the State showed Ross the picture of defendant at trial, however, he testified, "[s]ee, I really don't want to say it's that person because I really

couldn't see because there was a hoodie on, so I just remember certain features. I really can't say who it was if I really didn't see his face all the way."

¶ 9   Barnes, a 65-year-old retired plumber, testified that on October 8, 2014, at 3:00 p.m., he was sitting in his car near an elementary school waiting for his grandson. He was "dilly-dallying with [his] telephone" and heard a loud confrontation. He saw four or five girls "pushing and shoving and arguing," and observed a white car pull up. Three guys got out of the car. Two of the guys mingled with the girls and one of them "kind of stay[ed] around the corner a little bit." An apartment door opened, and Barnes saw a man step out and take four or five steps to the confrontation. Barnes testified that the guy who had stayed around the corner stepped out, took out a pistol, and shot the man who walked out of the apartment three or four times. Barnes identified defendant as the shooter in open court.

¶ 10   Barnes had "no problem seeing this defendant's face when he shot the victim" and testified that after defendant shot the man, he walked directly in front of Barnes' car. Defendant was so close he "could have reached out and touched [Barnes'] car." Defendant had a gun in one hand and a soda in the other. Barnes could "really could see [defendant] closely." It was about a minute between when Barnes first saw the man come to the side of the house until he walked past his car.

¶ 11   Barnes further testified that he met with Detective Tenton on October 23, 2014, and viewed a photo array. Barnes described the shooter to Detective Tenton as a light-skinned man, kind of stocky, about six feet tall, wearing a black jersey with some white on the front of it. Barnes immediately identified defendant as the shooter in the photo array. On October 27, 2014, he viewed a physical lineup at the police station and again identified defendant as the shooter.

¶ 12   Detective Tenton of the Chicago Police Department testified that he was assigned to investigate a shooting that occurred on October 8, 2014, on South Hermitage. He arrived at that location and found six or seven .45 caliber shell casings and a fired bullet. Detective Tenton spoke

with Barnes on the evening of October 8, 2014, and Barnes described the shooter as a black male, 18 to 20 years old, five feet, ten inches to six feet tall, with a thin build and a dark complexion. Detective Tenton visited Ross in the intensive care unit of Stroger Hospital eight days after the shooting. Ross described the shooter as a black male with a medium complexion, five feet, ten inches to six feet in height, and wearing a dark hooded sweatshirt and dark pants.

¶ 13    Detective Tenton compiled photo arrays based on the information provided and showed them to Ross and Barnes separately on October 23, 2014. Ross did not identify anyone in the first photo array, which did not include a photograph of defendant, but made a positive identification of defendant in the second photo array. Barnes identified defendant as the shooter in the first photo array he was shown. Both Ross and Barnes picked defendant out of a physical lineup conducted at the police station on October 27, 2014. Ross met with an Assistant State's Attorney and gave a statement indicating that defendant was the person who shot him. The State rested and defense counsel moved for a directed finding. The motion was denied and the defense rested.

¶ 14    The trial court found the testimony of Ross, Barnes, and Detective Tenton credible, and determined that Ross's and Barnes's eyewitness identification testimony was reliable. Based on the evidence presented, the trial court found that the State had failed to prove defendant's specific intent to kill beyond a reasonable doubt and acquitted him of the offense of attempted first-degree murder (720 ILCS 5/8-4(a) (West 2014)); *id*. § 9-1(a)(1)). The trial court, however, found defendant guilty of aggravated battery with a firearm (*id*. § 12-3.05(e)(1)). Defendant's motion for a new trial was denied.

¶ 15    The trial court held a sentencing hearing on February 7, 2017, and sentenced defendant to eight years in prison. Defendant moved the trial court to reconsider its sentencing determination. The motion was denied. Defendant filed a timely notice of appeal on February 17, 2017.

¶ 16    Defendant argues on appeal that his trial counsel's failure to call an expert witness to challenge the reliability of Ross's and Barnes's eyewitness identification testimony was objectively unreasonable and prejudicial. Defendant seeks a new trial.

¶ 17                                ANALYSIS

¶ 18    Claims of ineffective assistance, such as the one raised by defendant here, are governed by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). See *People v. Albanese,* 104 Ill. 2d 504 (1984) (adopting *Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Strickland,* 466 U.S. at 687. More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Unless the defendant makes both showings, we cannot conclude that he received ineffective assistance. *People v. Munson,* 171 Ill. 2d 158, 184 (1996). If an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient. *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 19    The State may carry its burden of proving guilt beyond a reasonable doubt through the testimony of a single, credible eyewitness, if the witness viewed the offender under circumstances permitting a positive identification. *People v. Smith*, 299 Ill. App. 3d 1056, 1061-62 (1998). In a bench trial, as we have here, the trial judge determines the reliability of an eyewitness's identification testimony. *People v. Slim,* 127 Ill. 2d 302, 307 (1989). The reliability of eyewitness identification testimony is based upon the totality of the circumstances and a consideration of the following factors: (1) opportunity for the witness to observe the offender at the scene of the crime,

(2) the witness' level of attention at the time of the crime, (3) accuracy of any prior identifications, (4) the witness' level of certainty at the "identification confrontation," and (5) the time between the crime and the confrontation. *Slim,* 127 Ill. 2d at 307-08.

¶ 20    Turning to the case at hand, defendant must make several threshold showings before we address his ineffective assistance counsel claim under *Strickland*. First, he must show that an expert witness would have formed the opinion based on the "studies" defendant cites in his opening brief that the eyewitness identification testimony of Ross and Barnes was unreliable. Second, defendant must demonstrate that the proposed "expert testimony on 'mugshot commitment,' and on how stress, the presence of a weapon, the ability to identify a stranger, and about the poor correlation between a witness' confidence level and the accuracy of their identification" would have been "relevant and appropriate" based on the facts and circumstances of this case. See *People v. Lerma*, 2016 IL 118496, ¶¶ 25-26 (holding that the trial court abused its discretion in refusing to admit expert testimony on the matter of eyewitness identification that was both "relevant and appropriate" based on the facts of the case). Defendant cannot make these threshold showings. He therefore fails to get out of the gate.

¶ 21    As defendant admits in his opening brief, he "cannot rely on an offer of proof to show exactly how an expert would have testified at his trial." Therefore, the opinion that Ross's and Barnes's testimony was unreliable, as well as the bases offered for it, are that of defendant and not an expert. It is at best speculative to conclude that an expert would have viewed the facts and circumstances of this case and formed an opinion of unreliability based on defendant's suppositions about the "stress" of the situation, the "presence of a weapon," the ability of Ross and Barnes to "identify a stranger," the generally "poor correlation between a witness' confidence level and the accuracy of their identification," and the phenomenon of "mugshot commitment," which

7

"occurs when a witness identifies a photo of a person who is then included in a later lineup procedure." After all, there is not one, but two eyewitness identifications of defendant as the shooter in this case, the second of which was made by a disinterested bystander who viewed the entire transaction as it unfolded from his parked car. Barnes saw defendant take his position around the corner, testified that he "really could see [defendant] closely," Barnes had "no problem seeing this defendant's face when he shot the victim," and observed defendant for a minute. The trial court found Barnes testimony to be positive and credible, and defendant has made no attempt on appeal to challenge the trial court's credibility determination as against the manifest weight of the evidence.

¶ 22    Given the state of the record and defendant's highly speculative contentions, we cannot say that an expert witness would have applied the "studies" to the eyewitness identification testimony of Barnes and Ross and concluded that it was unreliable. It is further unclear whether the proposed expert opinion of unreliability would have been relevant and appropriate based on the facts and circumstances of this case. Defendant cites *Lerma* in support of his argument that the "expert testimony on 'mugshot commitment,' and on how stress, the presence of a weapon, the ability to identify a stranger, and about the poor correlation between a witness' confidence level and the accuracy of their identification" would have been "relevant and appropriate" under the facts of this case. However, there are factual differences between this case and *Lerma* that may have affected the admissibility of the proposed expert testimony.

¶ 23    To be sure, our supreme court in *Lerma* stated that research concerning eyewitness identifications was "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony" and held that the trial court erred in refusing to admit expert testimony on the matter of eyewitness identification because it was both "relevant and appropriate"

8

based on the specific facts of the case. *Lerma*, 2016 IL 118496, ¶¶ 24-26. We heed the holding of our supreme court. But the record in *Lerma* contained facts that are not present in the instant record, and defendant fails to address them.

¶ 24    In *Lerma*, the victim's identification of the shooter by the nickname "Lucky" was admitted at trial under the excited utterance exception to the hearsay rule. *Lerma*, 2016 IL 118496, ¶ 5. Here, Ross saw defendant's nose and mouth from a distance five or six feet, identified him in a photo array and a physical lineup, and then he testified at trial that defendant "look[ed] like" the man in a hoodie who shot him. The additional eyewitness to the shooting in *Lerma*, testified that "she was with [the victim] on the unlit front steps of [his] Chicago home" when "[a]t approximately 11:20 p.m., a man dressed all in black approached [the victim's] house, pulled a gun, and began shooting." *Id.*, ¶ 6.

¶ 25    Barnes, the second eyewitness to the shooting in this case, did not know the victim, watched all the events that preceded the encounter between defendant and the victim from his parked car at 3:00 p.m. in the afternoon, and testified that he observed defendant for a minute and "really could see him closely." Moreover, the defendant in *Lerma* was tried before a jury. Here, the case was tried before a judge. "This court has held that expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion." *Lerma*, 2016 IL 118496, ¶ 23 (citing *People v. Cloutier,* 156 Ill. 2d 483, 501 (1993). Learned trial court judges are not average jurors.

¶ 26    Based on the apparent factual differences between *Lerma* and this case, which defendant did not address in his opening brief, it is at best unclear whether the expert testimony on the matter of eyewitness identification would have been "relevant or appropriate." Defendant's arguments on

appeal are marked by speculation. He has failed to make the threshold showing necessary for us to consider his ineffective assistance of counsel claim under the *Strickland* test. Accordingly, the claim fails. That said, even if defendant could show that an expert witness would have formed an opinion of unreliability based on the "studies" and the expert testimony as a whole would have been "relevant and appropriate," his ineffective assistance of counsel claim would fail under the prejudice prong of the *Strickland* test. *Graham*, 206 Ill. 2d at 476 (ineffective-assistance claims can be disposed of based on insufficient prejudice alone).

¶ 27    Though defendant is correct that the evidence presented by the State at trial consisted primarily of the eyewitness identification testimony of Ross and Barnes, it is well-established that the positive and credible eyewitness testimony of a single witness is sufficient to convict beyond a reasonable doubt if the witness viewed the offender under circumstances permitting a positive identification. *Smith*, 299 Ill. App. 3d at 1061-62. We find based on the totality of the circumstances in the record, there is no reasonable probability that, but for trial counsel's alleged error, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694.

¶ 28    The record in this case establishes that on October 8, 2014, at 3:00 p.m., Ross observed a fight between his sister and other girls at an elementary school next to his house. When a knife was pulled, Ross exited his house, removed the knife from a girl's hand, diffused the situation, and returned to the house with his sister to tend to her stab wounds. Ross cleaned the wounds and left his house to go to the corner store. Before he could close the door, a hooded man in all black holding a gun confronted him and stated, "Motherfuckers jumped on my sister." The man then shot Ross from five or six feet away, hitting him with bullets in the stomach and the leg. Ross collapsed on the floor of his house. Ross observed the man's nose and mouth, and gave his description to the police, who compiled a photo array of possible offenders. Ross identified

defendant as the shooter in the second photo array, gave a written statement to an Assistant State's Attorney, reaffirmed his identification of defendant, and then identified him again in a physical lineup. Ross identified defendant at trial indicating that he "look[ed] like" the shooter.

¶ 29    The record further establishes that Barnes, a 65-year old plumber who happened to be at the crime scene in his parked car waiting to pick up his grandson from elementary school, observed four or five girls arguing and then fighting. He saw a white car pull up and three guys, including defendant, get out. Two of the guys approached the girls while defendant "stay[ed] around the corner a little bit." Barnes saw an apartment door open, watched Ross exit and saw defendant, who had stayed around the corner, pull a gun, and shoot Ross three or four times. Barnes had "no problem seeing this defendant's face when he shot the victim." Barnes "really could see [defendant] closely" and watched defendant walk directly in front of his car. Defendant was so close to Barnes's car he could reach out and touch it. About a minute passed between the time Barnes first saw defendant come to the side of the house until defendant walked past his car.

¶ 30    Barnes gave Detective Tenton a description of defendant on October 8, 2014, and later identified defendant as the shooter in a photo array and in a physical lineup at the police station. Barnes also identified defendant as the shooter at trial. Finally, Detective Tenton corroborated the testimony of Ross and Barnes, indicating that he found shell casings and a fired bullet at the scene, and that both Ross and Barnes identified defendant and as the shooter in photo arrays and physical lineups.

¶ 31    The trial court as the finder of fact heard the live testimony of Ross, Barnes, and Detective Tenton, observed their demeanor and conduct in open court, and found their testimony to be positive and credible. *People v. Glover*, 2017 IL App (4th) 160586, ¶ 28 (the trial court is in the best position to make credibility determinations). We defer to the trial court's credibility

determinations as there exists no basis in the record for second guessing them. Based on the record testimony, the totality of the circumstances, and the factors that bear upon the reliability of eyewitness identification testimony (see *Slim,* 127 Ill. 2d at 307-08), we hold that even if defendant could make the requisite threshold showings, he cannot demonstrate under *Strickland* that the admission of an expert's opinion of unreliability would have changed the result of his bench trial. *Strickland,* 466 U.S. at 694. The judgment of the Circuit Court of Cook County is affirmed.

¶ 32                                    CONCLUSION

¶ 33     Accordingly, we affirm.

¶ 34     Affirmed.