2020 IL App (1st) 161735-U

No. 1-16-1735

Order filed February 21, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 20339 |
| | ) | |
| LEDELL PEOPLES, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed over his contentions that the trial court erroneously barred certain expert medical testimony and improperly instructed the jury. Defendant's 30-year sentence was not an abuse of discretion.

¶ 2    Following a jury trial, defendant Ledell Peoples was found guilty of two counts of first degree murder for the death of Maria Adams (720 ILCS 5/9-1(a)(1), (2) (West 2010)). The trial court merged the counts and sentenced defendant to 30 years in prison. On appeal, defendant contends that the trial court improperly excluded the testimony of Dr. Robert Hanlon, a

neuropsychologist who evaluated defendant, and erroneously instructed the jury. Defendant further contends that his 30-year sentence is excessive. We affirm.

¶ 3     The charges against defendant alleged that he stabbed, beat, and killed Ms. Adams without justification on October 31, 2011. The incident took place in defendant's home (the home) after he accused Ms. Adams of taking his Halloween candy. Defendant raised the defense of self-defense but not insanity. Dr. Hanlon, a defense expert, evaluated defendant on May 16, 2013. Dr. Hanlon found that defendant suffered from schizoaffective disorder, paranoid schizophrenia, cognitive disorder, and cocaine abuse, and was fit to stand trial with medication. His findings were contained in his initial written report. [1]

¶ 4     Prior to trial, defendant filed a motion *in limine* seeking the admission of Dr. Hanlon's testimony as to his findings. Defendant maintained that he was not seeking to assert a diminished capacity defense, which is not recognized in Illinois. Instead, defendant sought the admission of Dr. Hanlon's testimony as relevant to explain his mental state and his actions and reactions during the incident. The State, in a motion *in limine*, sought to bar Dr. Hanlon's testimony as irrelevant because defendant had not raised an insanity defense and could not assert diminished capacity. The court barred Dr. Hanlon's testimony as irrelevant and characterized the testimony as either "tantamount to an argument of diminished capacity," or a "ploy to garner sympathy from the jury."

¶ 5     Defendant moved to reconsider, arguing that defendant's medical conditions affected his belief in the justification of his actions and his need to act in self-defense. In support of his motion to reconsider and at the trial court's request, defendant filed addenda to Dr. Hanlon's initial report. The addenda included Dr. Hanlon's conclusions that defendant "manifests" multiple

---

[1] Dr. Hanlon's initial report is not in the record on appeal.

neurocognitive defects associated with his schizophrenic spectrum disorder and the "functional implications" of these defects, were defective impulse control, emotional regulation and behavioral regulation to perceived threats. The court denied the motion to reconsider, and later denied defendant's second motion *in limine* requesting that Dr. Hanlon be allowed to testify. The matter proceeded to a jury trial.

¶ 6    Chicago police officer John Davidson testified that he responded to the home on October 31, 2011. Defendant was on the front porch; he was calm and seemed "together." Officer Davidson asked what was going on, and defendant responded "That \*\*\* is crazy; she threw a plate at my head." Inside the home, paramedics were attending to an unconscious Ms. Adams. Officer Davidson observed a lot of blood, broken dishes on the ground, and three knives in the kitchen sink.

¶ 7    Chicago fire department ambulance commander Michael Nolan testified that he and his partner were at the home on October 31. They found Ms. Adams face down in a pool of blood. She was unresponsive and had a weak pulse. When Ms. Adams was turned over, Commander Nolan observed multiple, actively bleeding lacerations and puncture wounds to her face, cheek, and hands. Ms. Adams' blood pressure was low and her eye response was sluggish, which indicated trauma to the head.

¶ 8    The paramedics transported Ms. Adams to the hospital where she was examined by Dr. Andrew Dennis, a trauma surgeon. Dr. Dennis testified that Ms. Adams was unconscious, unable to breathe on her own, and had significant blood loss. Ms. Adams had over 20 stab wounds and lacerations. Her wounds indicated that she had been stabbed by someone holding a knife in each hand. Additionally, Ms. Adams suffered blunt force trauma to her head and had hematomas under

her scalp, injuries consistent with her head being stomped on or slammed into the floor. Ms. Adams had defensive wounds to the tops of her hands and fingers, as if she had put her hands up. Ms. Adams did not regain consciousness, and died on November 5, 2011.

¶ 9 The parties stipulated that Dr. Ariel Goldschmidt, an assistant medical examiner, would testify as follows. Dr. Goldschmidt performed Ms. Adams's autopsy and his external exam revealed over 28 wounds about her body. She had 10 "stab wounds" to the scalp, hands, and forearms; 18 "incise" wounds to the face; and multiple superficial incise wounds to the face, hands, and arm. Ms. Adams sustained hemorrhaging to the brain and injuries to the underside of her scalp. These injuries were consistent with being stabbed or stomped on the head. Dr. Goldschmidt opined that the cause of Ms. Adams' death was brain, cerebral edema and brain defect due to her stab wounds and her manner of death was homicide.

¶ 10 Chicago firefighter EMT Timothy Folliard testified that he and his partner treated defendant at the scene for a "minor" laceration over the right eye. Defendant explained that he received this injury when his girlfriend struck him with a plate, and that he then stabbed her with a knife multiple times.

¶ 11 Sargent Robert Garza testified that he investigated the incident. At the home, he found three knives in the sink and a pool of blood in the kitchen. After speaking with defendant at the hospital, Sargent Garza learned that defendant got dressed before calling 911.

¶ 12 Paul Chevlin testified that in 2011, he worked as an Assistant State's Attorney (ASA), and spoke to defendant at a police station on November 1, 2011. After ASA Chevlin advised defendant of his *Miranda* rights, defendant agreed to make a written statement. The statement was admitted into evidence and published. The following is a summary of this statement.

¶ 13    Defendant met Ms. Adams in 2007. Over the years, he had given her money and gifts in exchange for sexual intercourse. She would often spend the night at the home. On October 31, 2011, defendant noticed that a bag of Halloween candy was missing, and he remembered other items had gone missing at times when Ms. Adams had stayed over at the home. Ms. Adams denied taking the candy. He found the candy in Ms. Adams's coat pocket and confronted her. Ms. Adams threw a glass plate, which hit him above his eye. Defendant became angry and walked towards her, screaming. Ms. Adams grabbed two steak knives, but defendant wrestled her to the ground and forced the knives out of her hands.

¶ 14    At this point, defendant was on top of Ms. Adams. He was angered and wanted revenge. He picked up the knives and started to swing at her, aiming for her eye. While swinging the knife at her head, he cut Ms. Adams's head, arms, and hands. Defendant stopped when Ms. Adams turned over and was not fighting back. Defendant then grabbed Ms. Adams's hair and slammed her head into the floor three times. Ms. Adams was moaning; defendant was not sure if she was "faking." Defendant became more angry when thinking that he would be permanently scarred from the plate and that Ms. Adams was ungrateful for his kindnesses. He stomped on her back and her head. Defendant next went to a kitchen drawer and grabbed the "biggest" knife. Ms. Adams was laying still, but breathing. Defendant poked her with the big knife to see if she would move, but she remained still. Defendant thought about putting Ms. Adams outside. He realized that the police would trace her back to him because they had sexual intercourse an hour earlier. He also thought people would get "the wrong idea" as the police may suspect the incident was a rape or attempted murder. Defendant dressed, put the knives in the sink, and called 911.

¶ 15     At trial, defendant testified that he was 60 years old and an ordained minister. He and Ms. Adams, who worked as a prostitute, had a sexual relationship over several years. She would often stay overnight at the home and had done so on October 30, 2011.

¶ 16     On October 31, after finding missing Halloween candy in Ms. Adams's coat pocket, he confronted her. Ms. Adams, who was in the kitchen, responded by hitting him "hard" with a plate. He felt blood "dripping" from his head. Ms. Adams then "grabbed some knives" and came at him. He held Ms. Adams' hands to prevent her from cutting him and asked her to let go of the knives. In "tussling" for the knives, defendant "slammed" her hands until she let go of the knives.

¶ 17     Defendant and Ms. Adams both fell to the ground after slipping on his blood. Ms. Adams was on her stomach. Defendant scraped his knees as he was wearing only boxer shorts. When he saw his blood, he started to defend himself. Defendant grabbed Ms. Adams by her hair and moved her. Defendant touched Ms. Adams with a knife to get her to stop fighting. He did not "want to hurt her" or to kill her, but was forced into doing so to prevent Ms. Adams from killing him. Defendant did swing the knives "some" to keep her off of him. Ultimately, Ms. Adams stayed on the ground, but was "still moving" and did not look hurt. Defendant called the police. When asked whether he stomped on Ms. Adams's head, defendant stated "[n]ot actually as far as, you know doing it" but thought that he "got her some, but it was just self-defense." When counsel asked whether he stomped on Ms. Adams's back, he said he "went over her;" that is, his left foot touched her. He received "a little puncture wound to [his] chest, too, where the skin was tore." Throughout the incident, he believed he was going to be harmed by Ms. Adams.

¶ 18     During cross-examination, defendant testified that he had known Ms. Adams for about four years and, at the time of the incident, he "'was falling in love with her." He did sign his written

statement. Although defendant was given an opportunity to read that statement, "[i]t came up somewhat different" when it was read at trial. He did not remember saying that he slammed Ms. Adams's head to the ground three times or that he thought about hiding her body.

¶ 19   Defendant had received over 300 hours of training as a security officer. He subdued Ms. Adams as he had been trained to do. After defendant got the two knives, Ms. Adams tried to grab them and at that time he received the "little cut" to his chest. He did not tell the paramedics or police about this cut. He went for a third knife so that Ms. Adams would not get it. Defendant did not remember climbing on top of Ms. Adams but "kind of like [straddled] her" to make sure she did not sit up. He swung the knives in self-defense, but he did not see any wounds to Ms. Adams' because of her "hair and stuff." Defendant acknowledged that the skin missing from the top of her head might have been caused when he was defending himself. Ms. Adams was moving the last time he looked at her. He did not see any of "her" blood, just his own. He went upstairs, changed his clothes, and then called the police. When he returned to the first floor, defendant put the knives in the sink. Defendant denied stomping on Ms. Adams's head again after calling the police, but admitted that he touched Ms. Adams with his foot, to see if she needed help or whether she was "still trying to do something sneaky." He did not act in revenge; rather, he was "defensive" after Ms. Adams hit him with the plate.

¶ 20   Chicago police detective David Minelli testified in rebuttal. Detective Minelli spoke to defendant on October 31, 2011. After receiving his *Miranda* rights, defendant told the detective that he was very angry about his missing belongings and about Ms. Adams throwing a plate at him. He wanted revenge. Defendant further stated that after he was hit with the plate he lunged at Ms. Adams, and she armed herself with two small kitchen knives. Defendant knocked one of the

knives to the ground and took the other, slashing Ms. Adams multiple times to defend himself. Defendant ended up on top of Ms. Adams, who was on the floor, and "punched or pushed" her head one or two times. When Ms. Adams stopped fighting, he kicked her in the head because he thought she was "faking being hurt." Defendant waited 5 to 10 minutes to call emergency personnel. Defendant thought about putting Ms. Adams's body outside, but knew that the police would trace her back to him.

¶ 21   The trial court held a jury instruction conference where the defense requested instructions on second degree murder, based on the mitigating factors of serious provocation and unreasonable belief in justification. Over the State's objection, the court agreed. Defendant did not object to the court's decision to give an issue instruction on first degree murder (Illinois Pattern Jury Instructions, Criminal, No. 7.02 (approved Jan. 30, 2015) (hereinafter IPI Criminal No. 7.02))

¶ 22   As will be discussed in more detail during our review of the issues, during closing argument, both parties discussed whether defendant's actions constituted first or second degree murder and whether the mitigation factors applied.

¶ 23   The court then orally instructed the jury, including instructing on the elements of first degree murder in accordance with IPI Criminal No. 7.02, as follows:

> "First: That the defendant performed the acts which caused the death of Maria Adams.
>
> And second: That when the defendant did so, he intended to kill or do great bodily harm to Maria Adams or he knew that the acts would cause death to Maria Adams or he knew that his acts created a strong possibility of death or great bodily harm to Maria Adams.
>
> And third: That the defendant was not justified in using the force which he used.

> If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The same IPI Criminal No. 7.02 was given to the jury in writing.

¶ 24 Next, the court orally instructed the jury as to second degree murder under Illinois Pattern Jury Instructions, Criminal, No. 7.06B (approved Jan. 30, 2015) (hereinafter IPI Criminal No. 7.06B). In relevant part, the court stated:

> "The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder. By this I mean that you must be persuaded, considering all of the evidence in this case, that it is more probably true than not true that the following mitigating factor is present: That the defendant, at the time he performed the acts which caused the death of Maria Adams, believed the circumstances to be such that they were justified, the deadly force he used, but his belief that such circumstances existed was unreasonable or acted under a sudden and intense passion resulting from serious provocation by the deceased."

The trial court's written instruction tracked the IPI Criminal No. 706B oral instruction, but stated that, for the jury to find defendant guilty of second degree murder, it "must be persuaded, \*\*\* that the following *mitigating factor* is present" (emphasis added), namely, that his belief that circumstances justified the use of deadly force "was unreasonable acted [*sic*] under a sudden and intense passion resulting from serious provocation by the deceased."

¶ 25    After the jury was instructed, defendant moved for a mistrial, contending that the court should not have given both IPI Criminal Nos. 7.02 and 7.06B. The trial court denied the motion, as defense counsel had not objected to giving both instructions during the instruction conference. The court further found that there was no harm as both instructions "clearly state the law."

¶ 26    The jury found defendant guilty of two counts of first degree murder. Defendant filed a motion and an amended motion for a new trial, alleging, *inter alia*, that Dr. Hanlon should have been allowed to testify and that the trial court erred when it gave both IPI Criminal Nos. 7.02 and 7.06B. The trial court denied defendant's motions.

¶ 27    At the sentencing hearing, the court had the presentencing investigation report (PSI). The State read the victim impact statement of Ms. Adams's daughter Ariana, noted that Ms. Adams suffered numerous stab wounds resulting in her death, and stated that defendant had three prior felony convictions, two of which were "drug-related" and one for theft. In mitigation, defendant's counsel argued that defendant was then 60½ years old, he had been diagnosed with schizophrenia at age 29, his felony convictions were for nonviolent offenses, and he had acted in self-defense.

¶ 28    In allocution, defendant denied that he had a theft conviction. Defendant then stated as to the incident that he had the help of God in what he did, "because it was forced on me, not something that I chose to do." Defendant further stated that God knew whether he was guilty or not, and if God knew defendant was guilty, defendant would be on his way to hell. Defendant did not believe that he was going to hell, because he "murdered no one intentionally."

¶ 29    In sentencing defendant, the court stated that it considered the evidence presented in aggravation and mitigation, defendant's allocution, his age, his rehabilitative potential and nonviolent background. The court noted this was a "very violent offense" with many stab wounds

and that the reason for Ms. Adams's death "certainly was out there as one of the most senseless ridiculous reasons," *i.e.*, a dispute over candy. The court merged the first degree murder counts and sentenced defendant to 30 years in prison. Defendant's motion to reconsider that sentence was denied.

¶ 30   On appeal, defendant argues that the trial court erred in barring the testimony of Dr. Hanlon and in its instructions to the jury and, therefore, he is entitled to a new trial. In the alternative, he seeks a reduction in his sentence or a new sentencing hearing.

¶ 31   The merits of defendant's arguments for a new trial must be considered within the applicable law relating to first and second degree murder.

¶ 32   To sustain defendant's conviction for first degree murder, the State was required to prove he killed Ms. Adams by performing acts that were intended to kill, do great bodily harm, or create the strong possibility of death or great bodily harm, and that defendant committed those acts without lawful justification. 720 ILCS 5/9-1(a) (West 2010). Defendant argued, in part, that second degree murder applied here.

¶ 33   A defendant commits second degree murder when he commits first degree murder and at the time of the killing, one of the following mitigating factors is present: (1) the defendant was acting under an unreasonable belief that the killing was justified (imperfect self-defense) or (2) the defendant was acting under a sudden and intense passion resulting from serious provocation by the individual killed, but the defendant negligently or accidentally caused the death of the individual. 720 ILCS 5/9-2(a) (West 2010). The State must first prove all elements of first degree murder beyond a reasonable doubt. *People v. Thompson*, 354 Ill. App. 3d 579, 586 (2004). First degree murder is reduced to second degree murder, where the defendant proves the existence of

one of the mitigating factors by a preponderance of the evidence. *People v. Manning*, 2018 IL 122081, ¶ 18 (citing *People v. Jeffries*, 164 Ill. 2d 104, 114 (1995). If the defendant meets this burden, then the burden shifts back to the State to prove the absence of the mitigating factor beyond a reasonable doubt. *Thompson*, 354 Ill. App. 3d at 586.

¶ 34    The mitigating factor of imperfect self-defense applies where, at the time of the murder, the defendant unreasonably believes that circumstances exist which justifies deadly force, *i.e.* "that sudden force is necessary to prevent imminent death or great bodily harm to himself or another ***." 720 ILCS 5/9-1(a)(West 2010).

¶ 35    Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2010). Mutual combat or quarrel on equal terms and substantial physical injury are two categories of serious provocation. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). "The provocation must be proportionate to the manner in which the accused retaliated." *People v. Randall*, 2016 IL App (1st) 143371, ¶ 47 (quoting *People v. Austin*, 133 Ill. 2d 118, 125 (1989). Although defendant may argue in the alternative, "Illinois courts have previously stated that a claim of self-defense can negate an inference that a person acted under a sudden and intense passion." *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 47 (citing *People v. Clark*, 15 Ill. App. 3d 756, 759 (1973).

¶ 36    We now turn to defendant's argument that the trial court erred in barring Dr. Hanlon's testimony regarding his schizoaffective disorder.

¶ 37    " 'Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion.' " *People v. Patrick*, 233 Ill. 2d 62, 68 (2009) (quoting *People v. Harvey*, 211 Ill. 2d

368, 392 (2004)). "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 38    A criminal defendant's right to a fundamentally fair trial and due process includes the right to present witnesses on his behalf. *People v. Lerma*, 2016 IL 118496, ¶ 23. However, "the right to present a defense does not include the right to introduce irrelevant evidence." *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 44. "Relevant evidence is that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* ¶ 42 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). A trial court may reject evidence as irrelevant when the proposed evidence has little probative value because of its remoteness, uncertainty, or speculative nature. *People v. Enis*, 139 Ill. 2d 264, 282 (1990).

¶ 39    Here, defendant contends that Dr. Hanlon's expert testimony would have helped the jury understand the "effect" of defendant's "mental disorders on his functioning and cognitive disorder." He further argues Dr. Hanlon's testimony was "essential" to defendant's position that he should be found guilty of second degree murder because he had an unreasonable belief in the need for self-defense. The State disagrees, contending that the trial court's exclusion of the proposed testimony was proper where it was being offered in essence to prove defendant's "diminished capacity," a defense which does not exist in Illinois. We agree with the State.

¶ 40    "Diminished capacity is an affirmative defense that permits a 'legally sane defendant to present evidence of mental illness to negate the specific intent required to commit a particular crime.' " *People v. Johnson¸* 2018 IL App (1st) 140725, ¶ 63 (quoting *Metrish v. Lancaster*, 569

U.S. 351, 351 (2013)); see also Black's Law Dictionary 199 (7th ed. 1999) (defining "diminished capacity" as "An impaired mental condition—short of insanity—that is caused by intoxication, trauma, or disease and that prevents the person from having the mental state necessary to be held responsible for a crime."). Although this defense is recognized in some jurisdictions, others—including Illinois—have rejected it. See *People v. Hulitt*, 361 Ill. App. 3d 634, 636 (2005).

¶ 41    *Hulitt* is instructive. In that case, the defendant was charged with the first degree murder of her two-year-old daughter. Prior to trial, the defendant claimed that she did not intend to raise an insanity defense, but instead wanted to raise a "reasonable doubt defense" through the expert testimony of a psychologist showing that she suffered from postpartum depression which left her " 'unable to appreciate the danger of her actions toward [her daughter].' " *Id*. The State filed a motion *in limine* seeking to bar testimony from the psychologist as to the defendant's mental capacity. The trial court granted that motion, finding that the defendant was attempting to improperly raise a diminished capacity defense, which did not exist in Illinois. *Id*. at 636-37. On appeal, the defendant argued that she was not attempting to claim diminished capacity; rather, she was trying to show that she did not have the requisite intent to commit first degree murder.

¶ 42    This court affirmed the trial court's decision, concluding that the "[d]efendant could not raise [diminished capacity] as an affirmative defense and, therefore, should not be permitted to raise it in the guise of a reasonable doubt argument." *Id*. at 641. We noted that, in jurisdictions where it is recognized, the doctrine of diminished capacity permits a defendant to offer evidence of a mental condition in relation to her capacity to form the intent required for the commission of the charged offense. *Id*. at 640. We explained that:

"[d]iminished capacity is considered a partial defense because it is not presented as an excuse or justification for a crime but, rather, as an attempt to prove that the defendant, because she was incapable of forming the requisite intent of the crime charged, is innocent of that crime but likely guilty of a lesser included offense." *Id*. at 641.

¶ 43    Defendant argues that Dr. Hanlon's testimony as to his mental disorders would have explained his conduct to support a finding of the lesser offense of second degree murder. The trial court concluded that defendant was attempting to raise the defense of diminished capacity and banned the testimony. Following *Hulitt*, we do not believe the trial court abused its discretion.

¶ 44    Moreover, to the extent that defendant argues that Dr. Hanlon's testimony was expert testimony necessary to aid the jury "in deciding whether [defendant] had an unreasonable belief that his actions were justified by virtue of his mental disorders," we again find the trial court acted properly.

¶ 45    When deciding whether to admit expert testimony, the trial court should balance the probative value of the testimony against its prejudicial effect and should "carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *Lerma*, 2016 IL 118496, ¶ 23. Relevant and probative testimony should be admitted, but misleading or confusing testimony should not be. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 78. Expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will help the jury in reaching its conclusion. *Lerma*, 2016 IL 118496, ¶ 23. Expert testimony addressing matters of common knowledge is not admissible

" 'unless the subject at issue is difficult to understand and explain.' " *Id.* (quoting *People v. Becker*, 239 Ill. 2d 215, 235 (2010)).

¶ 46    Here, defendant maintains that Dr. Hanlon's testimony would have shown that defendant's "mental issues" affected his "response inhibition" and caused "problems with behavioral self-regulation" and would have explained his actions and helped the jury to determine whether defendant was guilty of first or second degree murder. However, the only evidence in the record showing the substance of Dr. Hanlon's purported testimony are the addenda to his initial report. Those addenda state that defendant "manifests" a schizophrenic-spectrum disorder" and "manifests multiple neurocognitive deficits typical of a schizophrenic-spectrum disorder." Dr. Hanlon lists "functional implications" of those deficits, including defective impulse control, emotional regulation, and behavioral regulation, which triggers reactions to perceived threats. The addenda do not state clearly that defendant actually suffers from any of these functional implications, or the extent to which he may suffer from them. The addenda do not reveal that Dr. Hanlon had an opinion that defendant's deficits, and any functional implication of his deficits, would have played a role in defendant's actions that resulted in Ms. Adams' violent death. Therefore, defendant's argument that Dr. Hanlon testimony would have explained defendant's conduct to the jury was speculative and unsupported by evidence. See *People v. Sargeant*, 292 Ill. App. 3d 508, 511 (1997) (an expert witness's opinion "should not be admitted if it is inconclusive or speculative").

¶ 47    Next, defendant argues that the trial court erred by providing improper jury instructions to the jury.

¶ 48    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). In determining whether jury instructions accurately stated the law, we consider the jury instructions as a whole. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 41. Our review is *de novo*. *Id.*

¶ 49    Defendant first contends that the trial court erred by using both IPI Criminal No. 7.02 (the elements of first degree murder) and IPI Criminal No. 7.06B (the elements of first degree murder and second degree murder). The committee notes for IPI Criminal No. 7.02 provide that this instruction is to be used "only when the court is not also instructing on the lesser offense of second degree murder," and where the court is also instructing the jury on second degree murder, "the combined issues Instruction 7.04 or 7.06" should be used. Defendant believes that the jury would have been confused by the two instructions, and as a result would have considered only first degree murder and ignored second degree murder.

¶ 50    The State agrees that the trial court did not follow the committee notes, but argues that any error was harmless when the jury received both IPI Criminal Nos. 702 and 706B. See *People v. Washington*, 2012 IL 110283, ¶ 60 ("instructional errors are deemed harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed"). We agree with the State.

¶ 51    Our supreme court has held that "[j]ury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them [citation]." *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005). Here, the two challenged jury

instructions, taken as a whole, fully apprised the jury as to its consideration of both first and second degree murder. See *People v. Parker*, 223 Ill. 2d 494, 501 (2006) (jury instructions are adequate, if taken as a whole, they fairly, fully, and comprehensively apprise the jury of the relevant legal principles).

¶ 52    Additionally, other instructions informed the jury as to its considerations of second degree murder. The jury was instructed that defendant had been charged with first degree murder and that a person charged with first degree murder could be found guilty of second degree murder. The jury was instructed as to the parties' burdens of proof, including that if the State proved defendant guilty beyond a reasonable doubt of first degree murder, defendant then had the burden of proving by the preponderance of the evidence the existence of a mitigating factor "so that he is guilty of second degree murder, and not guilty of first degree murder." In defining each of the mitigating factors, the jury was instructed that the existence of a mitigating factor would reduce the offense of first degree murder to second degree murder. The jury received verdict forms as to both first and second degree murder and was instructed to use the form which reflected its verdict.

¶ 53    Moreover, in their closing arguments, the State and the defendant explained that the jury was to consider both first and second degree murder. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 127 ("The closing arguments of the parties are also instrumental in forming a jury's understanding of the law and can compensate for confusing aspects of the instructions."). Specifically, the State explained the law as it pertained to both first degree and second degree murder, and that the jury could not consider whether defendant was guilty of second degree murder "until and unless" the jury determined that the State had proven that defendant was guilty of first degree murder. Defendant's counsel also argued that the jury was to consider second degree

murder if it determined that defendant's belief that he needed to act in self-defense was not reasonable. Thus, we cannot agree with defendant that the jury would have ignored the second degree murder instructions because the trial court instructed it with both IPI Criminal No. 7.02 and IPI Criminal No. 7.06B.

¶ 54    We are unpersuaded by defendant's reliance on *People v. Ayers*, 331 Ill. App. 3d 742 (2002). In that case, the defendant was charged with murder and claimed self-defense, which the court termed a "mitigating factor." *Id*. at 750. The instructions to the jury defining first and second degree murder were incomplete, where one instruction omitted that the State must prove the defendant was not justified in using the force employed, while another instruction included this language.

¶ 55    On appeal, this court determined that the giving of these instructions forced the jury to "choose between two contradictory instructions which related to a central issue in the case, self-defense." *Id.* at 750. Therefore, the jury could have ended its deliberations without considering the defendant's self-defense argument and convicted him "on the basis of the incorrect instruction." *Id*. The court concluded that in those cases "[w]here conflicting instructions are given, one of which is a correct statement of the law and the other is an incorrect statement of the law, the error is not harmless and constitutes grave error" requiring reversal. *Id.* at 750, 752.

¶ 56    Here, unlike *Ayers*, there is no contradiction in the instructions that were tendered to the jury as to their consideration of first and second degree murder. Rather, the jury was repeatedly instructed that it was to consider second degree murder if it determined the State had proved first degree murder beyond a reasonable doubt. "[T]he purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thus enabling the jury to reach a proper

conclusion based on the applicable law and the evidence presented." *Parker*, 223 Ill. 2d at 500. This jury was well aware that it was to consider second degree murder if it determined that the State had proven defendant guilty of first degree murder. Any error from the trial court instructing the jury with both IPI Criminal No. 7.02 and IPI Criminal No. 7.06B was harmless.

¶ 57 Defendant next contends that the errors in the verbal and written versions of IPI Criminal No. 706B caused the jury to "wrongly believe" that, to find defendant guilty of second degree murder, it had to determine both that he had an unreasonable belief in justification and that he acted under a sudden and intense passion.

¶ 58 Defendant acknowledges that he failed to raise this issue before the trial court and has consequently forfeited the claim of error for review. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). However, defendant argues that under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require."

¶ 59 When a defendant invokes review under Rule 451(c), we utilize the plain error doctrine to review the claim of error. *People v. Durr*, 215 Ill. 2d 283, 296-97 (2005). Under the plain-error doctrine, this court may review an unpreserved claim of error when there was a clear or obvious error, and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. The first step of plain error review is to determine whether a clear or obvious error occurred. *Id.* at ¶¶ 49-51.

¶ 60    The State concedes, correctly, that the trial court's verbal and written instructions did not follow the precise language of IPI Criminal No. 7.06B. In relevant part, the text of the instruction states that in order to find defendant guilty of second degree murder, the jury:

> "must be persuaded, considering all the evidence in this case, that it is more probably true than not true that either of the following mitigating factors is present: that the defendant, at the time he performed the acts which caused the death of _____, believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable, or acted under a sudden and intense passion resulting from serious provocation."

¶ 61    In contrast, in its oral instruction the trial court told the jury that it:

> "must be persuaded, considering all of the evidence in this case, that it is more probably true than not true that the following mitigating factor is present: That the defendant, at the time he performed the acts which caused the death of Maria Adams, believed the circumstances to be such that they were justified, the deadly force he used, but his belief that such circumstances existed was unreasonable or acted under a sudden and intense passion resulting from serious provocation."

That is, the trial court omitted "either" in the phrase "either of the following mitigating factors is present."

¶ 62    The written IPI Criminal No. 706B instruction provided by the trial court stated that the jury must be persuaded that:

> "considering all the evidence in this case, that it is more probably true than not true that the following mitigating factor is present: that the defendant, at the time he performed the acts

which caused the death of Maria Adams, believed the circumstances to be such that they

justified the deadly force that he used, but his belief that such circumstances existed was

unreasonable acted under a sudden and intense passion resulting from serious provocation

by the deceased."

In other words, the written instruction omitted "either" from the phrase "either of the following

mitigating factors is present," as well as "or" between the two mitigating factors. Because the trial

court erred in its wording of IPI Criminal 7.06B, the question is whether either prong of the plain-

error test is met.

¶ 63    Defendant argues that the evidence at trial was closely balanced when there was "ample

evidence" that he committed second degree murder, *i.e.* that he "fought back in self-defense and

because of [Ms. Adams] provocation which created in him a sudden and intense passion." We

disagree.

¶ 64    The evidence at trial established that defendant, using two knives, one in each hand,

stabbed Ms. Adams more than 20 times, causing her to lose "the majority" of her blood volume

before she arrived at a hospital. He inflicted most of the wounds while Ms. Adams lay still on the

floor and was unarmed. He also caused blunt force trauma to her head by stomping on her head or

slamming her head on the floor. According to defendant he suffered only a unreported, small

unreported wound to his chest. The evidence at trial was not closely balanced as to the issue of

first degree murder.

¶ 65    Moreover, the evidence was not closely balanced as to the existence of either mitigating

factor. Although defendant testified that he acted in self-defense, his statements to the police were

that he became angry at Ms. Adams for throwing a plate at him and for being ungrateful. He also

told the police that he wanted revenge for being hit with the plate above his eye. Defendant also armed himself with three knives, getting a bigger knife after Ms. Adams became still. Defendant's use of force after Ms. Adams was unarmed and helpless on the floor does not establish imperfect self-defense. We also note that it was Ms. Adams and not defendant who suffered defensive wounds. As to the mitigating factor of provocation, his claims of self-defense at trial serve to negate an inference that he was acting under a sudden and intense passion. *Bennett*, 2016 IL App (1st) 151619, ¶ 47. Moreover, the "mutual combat" here was not on equal terms nor did defendant act in a manner proportionate to any provocation by Ms. Adams. Accordingly, defendant has failed to persuade us that the trial court's phrasing of IPI Criminal No. 7.06B threatened to tip the scales of justice against him. Therefore, there can be no first-prong plain error. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 66   As to the second prong of plain error, defendant argues that the complained-of error caused the jury to believe that in order to find defendant guilty of second degree murder, it had to find the existence of both mitigating factors rather than the existence of a single mitigating factor.

¶ 67   Second-prong plain error is not restricted to the six types of structural error that have been recognized by the United States Supreme Court. See *id*. ¶ 46; *Thompson*, 238 Ill. 2d at 609 (stating that the United States Supreme Court has recognized structural error to include "a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction"). However, to rise to the level of second-prong plain error, "the error nevertheless must be of a similar kind: an error affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (Internal quotation marks omitted.) *People v. Johnson*, 2017 IL

App (2d) 141241, ¶ 51. An error in a jury instruction rises to the level of plain error only when the error "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Sargent*, 239 Ill. 2d 166, 191 (2010). When reviewing "the effect of an instructional error, we consider the jury instructions 'as a whole,' rather than considering the error 'in isolation.' " *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 68 (quoting *Parker*, 223 Ill. 2d at 501).

¶ 68    Although the IPI Criminal No. 706B oral instruction to the jury provided that the jury must find it "is more probably true than not true that the following mitigating factor[was] present," the instruction later referred to defendant's "belief that such circumstances existed was unreasonable or acted under a sudden and intense passion resulting from serious provocation." Thus, the "or" made it clear that there were two mitigating factors to consider. Additionally, as discussed, the jury received two separate instructions, one defining the mitigating factor of self-defense and one defining the mitigating factor of provocation. These instructions informed the jury of two distinct mitigating factors. The burden of proof instruction as well as IPI Criminal No. 706B as given to the jury also explained that defendant had the burden of establishing the existence of "a" mitigating factor and not both mitigating factors. Moreover, during closing argument, the parties discussed the difference between first degree and second degree murder, and both parties highlighted that there were two separate mitigating factors which could lead to a verdict of second degree murder. When viewing the entirety of the jury instructions, the omissions in the versions of IPI Criminal No. 7.06B given to the jury did not create "a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Sargent*, 239 Ill. 2d at 191. Thus, defendant's plain error argument must fail.

¶ 69    As defendant has not established plain error, we need not address defendant's alternative argument that trial counsel was ineffective for failing to object when the jury was instructed with incomplete versions of IPI Criminal No. 7.06B. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 70    Finally, we address defendant's argument that his sentence is excessive.

¶ 71    The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). It is not the function of a reviewing court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *Stacey*, 193 Ill. 2d at 209. We will overturn a sentence only where the court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 72    The statutory sentencing range for first degree murder is a term of imprisonment of between 20 and 60 years (730 ILCS 5/5-4.5-20(a) (West 2010)). Thus, the defendant's 30-year sentence is within this statutory range, and we presume it is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant cannot make this showing, as his sentence exceeds the minimum by only 10 years and is not manifestly disproportionate to the offense of first degree murder.

¶ 73    Notwithstanding, defendant argues that the trial court failed to consider that for defendant, a 60-year old, the 30-year sentence constitutes a "life sentence," and discounted his capacity for rehabilitation and lack of prior violence. Defendant also contends that the trial court failed to consider that Ms. Adams started the fight and that he suffers from mental illness. The record does no support defendant's contentions.

¶ 74    The PSI included defendant's diagnosis for schizophrenia. In sentencing defendant, the trial court stated that it had considered the evidence in mitigation, which included defendant's history of mental illness. Additionally, the court specifically mentioned defendant's age, rehabilitative potential, and nonviolent background. The court voiced its understanding of the impact of a lengthy sentence in light of defendant's age. The court also observed that Ms. Adams suffered extensive injuries and that this "very violent" offense resulted from a dispute over Halloween candy. The trial court is not required to give more weight to a defendant's rehabilitative potential than the seriousness of the offense, which is "the most important factor in fashioning an appropriate sentence." *People v. Gutierrez*, 402 Ill. App. 3d 866, 902 (2010).

¶ 75    Defendant essentially asks this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to do so. The record reflects that the trial court properly considered the nature and circumstances of the offense and defendant's actions in the commission of that offense. See *People v. Raymond*, 404 Ill. App 3d 1028, 1069 (2010). A sentencing court does not abuse its discretion because it did not afford greater weight to the mitigation evidence over the seriousness of the offense. Defendant has failed to show the sentence is excessive.

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 77    Affirmed.