2021 IL App (1st) 170978-U
No. 1-17-0978
March 22, 2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1)

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 8055 |
| | ) | |
| GABRIEL REEVES | ) | The Honorable |
| | ) | Rickey Jones |
| Petitioner-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

*Held*: The circuit court's denial of defendant's petition for post-conviction relief after third-stage proceedings was not manifestly erroneous.

¶ 1        Petitioner, Gabriel Reeves, was indicted for the murders of Richard and Ronald Phillips. Reeves waived his right to trial by jury and was found guilty at a bench trial of two counts of first-degree murder and sentenced to a term of natural life imprisonment. He filed a post-conviction petition alleging, *inter alia*, that his trial counsel was ineffective for failing to call an expert on eyewitness identifications, where the only evidence against him came from an

eyewitness with limited opportunity to observe the shooter. The circuit court denied the claim and dismissed the petition after an evidentiary hearing. Reeves appeals the dismissal of his petition. For the following reasons, we affirm.

¶ 2                                                    BACKGROUND

¶ 3      On the night of October 6, 2001, a large group of approximately 100 friends and family gathered at the New Phillips Lounge located at 2434 East 87th Street in Chicago, Illinois, for a birthday/going away party. Cousins Richard and Ronald arrived after midnight with Richard's girlfriend, Serynthia Jefferson. Due to overcrowding, the lounge closed early at 1:30 a.m. After the lounge closed, Richard and Ronald were outside speaking with other attendees when a man fired a semi-automatic weapon at close range, killing both men. Multiple eyewitnesses later identified Reeves as the shooter.

¶ 4      Teoqua Gardner was one of the eyewitnesses who identified the shooter as Reeves. Gardner was a cousin of Richard and Ronald and attended the party that night. At trial, Gardner testified that when she exited the lounge, she noticed Richard and Jefferson arguing and pulling on each other. Gardner intervened and told Jefferson to ride with her to another bar. The two walked toward Gardner's car, which was parked across the street from the lounge. Michelle Bernaugh, a friend of Gardner's, was already seated in the car. Ronald and Richard then walked over to the car. Ronald and Gardner leaned against the car, talking, and Richard and Jefferson stood a couple feet from the car, talking. As Gardner spoke with Ronald, she heard gunfire coming from behind her. According to Gardner, Richard was shot first. While Richard was falling, Gardner saw the shooter standing next to him with a gun. Seconds later, Ronald was shot with

a total of four shots. After shooting both men, the shooter used foul language, then walked away.

¶ 5    Gardner testified that she recognized the shooter as someone from high school and from the neighborhood but could not remember his name at the time of the shooting. Gardner attended Bowen High School from 1990-93 and had often seen Reeves in school in 1992 but had only seen him a couple of times since then. Gardner told police she would be able to identify the shooter if shown a picture. She identified Reeves as the shooter in a January 2002 photo array and again in a February 2002 lineup.

¶ 6    Gardner admitted on cross-examination that she looked at Reeves' picture in her high school yearbook before identifying him in the police photo array. At trial, she could not remember whether she told police that she looked at the yearbook. The parties stipulated that no police report indicated that Gardner ever told police she looked at her high school yearbook to identify the shooter. Gardner also admitted she told Bernaugh and another friend, Deborah Smith, that she found Reeves' picture in the yearbook but claimed she did not show the picture to either of them or to Jefferson.

¶ 7    Jefferson also identified the shooter in court as Reeves but said she had never seen him before the shooting. Jefferson testified that when she was outside the lounge after it closed, she was about to go with Gardner when she heard a few shots coming from behind her and to the right. She turned around, looked at Richard, and saw that Richard was bleeding and had been shot in the top of his head. Richard fell, and she tried to hold him up. According to Jefferson, Ronald was nearly four feet away, laying on the ground, and not moving. Jefferson attempted to speak with police when they arrived in the early morning hours of October 7 but was too

distraught to clearly recount the events surrounding the shooting. She later identified Reeves as the shooter in a January 2002 photo array and a February 2002 lineup.

¶ 8    On direct examination, Jefferson first testified that she did not see anyone holding a gun and did not see anyone shoot Richard or Ronald. She looked up from Richard only after the shooting and saw the shooter walking toward the alley near the lounge and holding a gun in his left hand. He was wearing a black hooded sweatshirt with the hood over his head. After further questioning on direct, Jefferson said Reeves was four to five feet away from her when she saw him walk up to Richard and heard a gunshot.

¶ 9    Bernaugh also identified the shooter as Reeves. After the lounge closed, Bernaugh sat in the passenger seat of Gardner's car while Gardner, Jefferson, Richard, and Ronald talked outside. While waiting in the car, Bernaugh saw the shooter approach the car from across the street. According to Bernaugh, the shooter was wearing a hooded, gray jogging suit with the hood down. The shooter pulled his gun from his right pocket and rapidly fired four to five shots. He was about twelve feet away from Michelle when he shot Richard and Ronald. Bernaugh could see that the shooter was saying something but could not hear it because the windows were up. After shooting both men, the shooter walked away northbound down Phillips Avenues. She later identified Reeves as the shooter in a January 2002 photo array and in a February 2002 lineup.

¶ 10    At trial, Bernaugh admitted she had never seen Reeves before the night of the shooting. The parties stipulated that she told a police detective on the day of the incident that she did not get a good look at the shooter's face. Bernaugh testified that she never discussed the morning of the shooting with Gardner or Smith.

¶ 11        Smith also identified Reeves at trial but did not identify him as the shooter, only that he was inside of the lounge that night. Smith testified she had never seen Reeves before the morning of the shooting. According to Smith, Reeves was at the bar in the lounge between 12:30 a.m. and 1:00 a.m. and stood two to three feet away from her. Smith only glanced at him and did not remember what he was wearing. Smith testified that she never discussed the shooting with Gardner, despite being best friends with her at the time. Smith later identified Reeves in a January 2002 photo array and a February 2002 lineup as the person she saw inside the lounge.

¶ 12        The defense presented one witness, Octavia Sawyer. Sawyer had known Reeves for more than ten years, but they were not friends. Sawyer testified she was at the New Phillips Lounge from 10:30 p.m. or 11:00 p.m. on October 6, 2001, until the lounge closed. Sawyer walked around the lounge and saw Gardner and Bernaugh at the bar. She left the bar around 1:30 a.m. in her car and never heard any gunshots. Sawyer testified that she never saw Reeves inside or outside the lounge that night.

¶ 13        Following closing arguments, the circuit court found Reeves guilty of the first-degree murder of Richard and Ronald. Reeves filed a motion for a new trial, which was denied. Following a sentencing hearing, Reeves was sentenced to a term of natural life imprisonment.

¶ 14        On direct appeal, counsel filed a motion pursuant to *Anders v. California*, 386 U.S. 738, 18 (1967), to withdraw based on counsel's conclusion that an appeal in the case would be frivolous. Reeves filed a *pro se* response arguing that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt, he was denied his right to effective assistance of

trial counsel, and the State knowingly used perjured testimony. The appellate court affirmed the judgment of the circuit court.

¶ 15    On May 23, 2006, Reeves filed a petition for post-conviction relief alleging, among other issues, ineffective assistance of trial counsel for his failure to call an available alibi witness. On August 15, 2006, the circuit court summarily dismissed the petition. Reeves appealed the summary dismissal arguing that he presented the gist of a claim of ineffective assistance for failing to call an alibi witness. The appellate court reversed, holding Reeves' claim merited that he be appointed counsel and advance to second-stage post-conviction proceedings.

¶ 16    On remand, appointed counsel filed a supplemental petition adding a claim of ineffective assistance of counsel for failing to call an eyewitness identification expert at trial. In support of this new claim, Reeves attached a report by Dr. Geoffrey Loftus, a psychology professor specializing in human perception, who explained how current research on the reliability of eyewitness accounts applied to Reeves' case. The State filed a motion to dismiss the petition. After arguments on the State's motion, the circuit court granted a third-stage evidentiary hearing on both of Reeves' claims in his supplemental petition.

¶ 17    At the beginning of the evidentiary hearing, Reeves withdrew the alibi witness issue and proceeded solely on the claim of ineffective assistance of counsel for failing to call an eyewitness identification expert at trial. The only evidence presented was the testimony of Dr. Loftus.

¶ 18    Dr. Loftus testified generally about the fallibility of eyewitness identifications. He emphasized the importance of having good lighting, sufficient time, and a good opportunity to observe events in forming accurate memories. He also described the role of post-event

information in altering a person's original memory of an event. Specifically, he described instances where memory of an event is contaminated with false post-event information that a person believes to be accurate. He testified that experiments in laboratories have shown misidentifications by witnesses, such as false positive identifications of strangers as familiar people from the past.

¶ 19    Dr. Loftus testified that in a large percentage of exoneration cases, there were eyewitnesses who confidently, yet falsely, identified a defendant as the person they saw commit the crime. If a witness expresses a great deal of confidence in a memory, the circumstances for forming the memory were good, and there was no potentially contaminating post-event information, then this would lead to an indication that the witness is accurate. However, if the circumstances for forming the memory were poor and there were potentially contaminating sources of post-event information, then under those circumstances, high confidence on the witness's part does not necessarily imply a high accuracy level.

¶ 20    Upon questioning from the court, Dr. Loftus acknowledged that a witness could wind up with accurate post-event information that would not affect the accuracy of the witness' identification.

¶ 21    Dr. Loftus also testified that lineup identifications in which police officers know who the subject is and double identifications, where the suspect is the only person who appears in the photo array and in the lineup, are intrinsically biased and more likely to produce false identifications. Similarly, simultaneous lineups, where a witness views all the lineup participants simultaneously, are likely to produce circumstances where police officers give the

witnesses subtle hints that the witness had chosen the correct person. When this occurs, the witness becomes more confident that they had chosen the right person.

¶ 22        Dr. Loftus testified that double blind lineups are recommended by the scientific community to eliminate the possibility of the officer giving subtle, nonverbal information to the witness. He also noted that sequential lineups, where the witness views the participants one at a time, are preferred over simultaneous lineups due to a lesser risk for false identifications.

¶ 23        Dr. Loftus also opined about issues in this case. He testified that poor lighting, limited time to view events, alcohol consumption, high stress from the presence of the gun, were all factors that contributed to witnesses' inability to acquire accurate information. He concluded that under the circumstances present at the shooting of the cousins, it was unlikely that three witnesses who did not know Reeves would all be able to make independent, accurate identifications from an unbiased photo array. Three months had elapsed between the crime and the witnesses' participation in the identification procedures. Under those circumstances, the chances that three witnesses who did not know the offender would all independently choose the same suspect from the lineup were minimal. However, on cross-examination, he noted that it was possible that any number of them could have correctly identified him.

¶ 24        Throughout the testimony, the circuit court intervened and asked its own questions. In several of its questions, the circuit referred to Dr. Loftus' testimony as "common sense." Dr. Loftus acknowledged that many of the concepts to which he was testifying were common sense factors.

¶ 25        At the conclusion of Dr. Loftus' testimony, Reeves admitted his exhibits into evidence and rested. The State rested without presenting witnesses. After arguments by both parties, the

court noted that it had presided over the original bench trial and had "carefully, meticulously and thoroughly considered all of the evidence and testimony." The court found that evidence presented at the evidentiary hearing would not have changed its guilty finding but instead would have "strengthened and enhanced" it. The circuit court found no constitutional violations and denied the post-conviction petition.

¶ 26    This timely appeal followed.

¶ 27                                    ANALYSIS

¶ 28    On appeal, Reeves argues the circuit court's dismissal of the post-conviction petition following the evidentiary hearing was against the manifest weight of the evidence. Specifically, Reeves contends Dr. Loftus' testimony demonstrated that his opinion would have significantly undermined the testimony of the State's central eyewitnesses and substantially aided the defense, had it been presented at trial.

¶ 29    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq*. (West 2018)) establishes a process by which those under criminal sentence can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Tate*, 2012 IL 112214, ¶ 8. In cases not involving the death penalty, a post-conviction proceeding contains three stages. *Id*., ¶ 9. At the first stage, the circuit court must independently review the post-conviction petition and determine whether "the petition is frivolous or is patently without merit." *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). The court must dismiss the petition in a written order if it determines the petition is either frivolous or patently without merit. *Id*.

¶ 30    If the circuit court does not dismiss the petition at the first stage, it advances to the second stage. *People v. Domagala*, 2013 IL 113688, ¶ 33. At the second stage, counsel is appointed to represent the defendant, if necessary, and the State may move to dismiss or answer the petition. *Id*. At this stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If no such showing is made, the petition will be dismissed. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). However, if a substantial showing of a constitutional violation is made, then the petition advances to the third stage, where the circuit court conducts an evidentiary hearing. *Id.*

¶ 31    At the third stage evidentiary hearing, the burden is again on the petitioner to make a substantial showing of a deprivation of constitutional rights. *Pendleton*, 223 Ill. 2d at 473. Following an evidentiary hearing where fact-finding and credibility determinations are involved, this court will not reverse the circuit court's decision unless it is manifestly erroneous. *Id.* Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Beaman*, 229 Ill. 2d 56, 74 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 32    Reeves was granted an evidentiary hearing to determine whether his trial counsel was ineffective for failing to call an eyewitness identification expert to testify at his bench trial.

¶ 33    A criminal defendant has the right to the effective assistance of counsel under both the United States and Illinois constitutions. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). In determining whether a defendant was denied effective assistance of counsel, this court applies the familiar two-prong test set forth in *Strickland*. A defendant must demonstrate that (1) trial counsel's representation was deficient and (2) the deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36.

If a defendant fails to establish either prong, his claim of ineffective assistance of counsel fails. *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 34    To satisfy the first prong of *Strickland*, "a defendant must show that his counsel's performance was so inadequate that counsel was not functioning as the "counsel" guaranteed by the sixth amendment." *People v. Smith*, 195 Ill. 2d 179, 188 (2000). "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *Id*. Additionally, the defendant must overcome the strong presumption that the challenged action or inaction may have been a product of sound trial strategy. *Id*. This court is highly deferential to trial counsel on matters of trial strategy. *People v. Perry*, 247 Ill. 2d 312, 344 (2007). However, we will find counsel's performance to be deficient where the "trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." *People v. Reid*, 179 Ill. 2d 297, 310 (1997).

¶ 35    In this case, the only evidence linking Reeves to the shooting was the testimony of four eyewitnesses. Garner, who knew Reeves from high school and from around the neighborhood, consulted a yearbook to confirm her belief that she recognized the shooter. The other three witnesses, Jefferson, Bernaugh, and White, were all friends with Garner and had never seen Reeves prior to the shooting but identified him three months later. Reeves contends the testimony of an eyewitness identification expert would have been crucial for the defense and that without such testimony trial counsel was limited in his ability to challenge the reliability of the State's witnesses. The State counters arguing that trial counsel's performance was not deficient because counsel was able to make the same challenges to the eyewitness identifications through cross-examination and closing argument.

¶ 36     We reject the State's argument that trial counsel's closing argument was an adequate substitute for expert testimony if similar points are made. "[C]losing arguments are not evidence and any statements or arguments made at closing that are not based on the evidence should be disregarded." *People v. Wheeler*, 226 Ill. 92, 137 (2007). However, regarding the cross-examination of the four eyewitnesses, counsel was able to bring out the same factors to which Dr. Loftus testified. Specifically, he discussed the witnesses' alcohol consumption, their degree of attention, the short passage of time, most of the witnesses' unfamiliarity with Reeves, the lighting conditions, and the distance between them and the shooter.

¶ 37     Nonetheless, Reeves argues that without an expert witness, trial counsel was unable to make a key argument that the witnesses must have spoken to each other or gained post-event information to identify Reeves. Counsel attempted to make this argument, but the State objected, and the circuit court sustained the objection because there was no evidence to support the argument. If Dr. Loftus had testified at trial, then counsel may have been able to make an argument that the witnesses gained post-event information. At the evidentiary hearing, Dr. Loftus opined, "it is unlikely that three witnesses under the circumstances that they observed this event would all be able to make independent, accurate identifications from an unbiased photo lineup three months later." In his report, Dr. Loftus explained that a more plausible explanation for the witnesses' selection of Reeves would either be that their selections were not independent, or they had access to information about his appearance prior to identifying him in the lineups.

¶ 38     Relying on *People v. Lerma*, 2016 IL 118496, Reeves argues expert testimony would have been probative and admissible. In *Lerma*, the defendant was convicted of first-degree murder.

*Id.* ¶ 16. The only evidence of defendant's guilt consisted of two eyewitnesses. *Id.* ¶ 5. The first eyewitness identification was made by the victim and was admitted into evidence under the excited utterance exception to the hearsay rule. *Id.* The second eyewitness was present when the victim was shot and identified the defendant the morning after the shooting, and then again one day later. At trial, she admitted that she had seen defendant only "once or twice" before the shooting. *Id.* Because the State's case against the defendant rested entirely on the reliability of its eyewitness identifications, our supreme court found that expert eyewitness testimony was both "relevant and appropriate." *Id.*

¶ 39    Like in *Lerma*, we agree that expert eyewitness testimony would have been relevant and appropriate in this case where the only evidence presented against Reeves was eyewitness testimony. Additionally, most of the factors that Dr. Loftus identified as potentially contributing to the unreliability of eyewitness testimony are present. These include the stress of the event itself, the use and presence of a weapon, the wearing of a partial disguise, exposure to post-event information, and nighttime viewing. However, the admissibility of expert testimony is not the issue before this court. In *Lerma*, our supreme court held that the circuit court abused its discretion by denying expert testimony. 2016 IL 118496, ¶ 27. Specifically, the circuit court ignored the contents of the expert witness' report and "effectively substituted its own opinion on a matter of uncommon knowledge for that of a respected and qualified expert." *Id.* ¶ 28. This did not occur in Reeves' case. Instead, the only issue here is whether trial counsel was ineffective for not calling an expert witness. These are "manifestly different" issues. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 39.

¶ 40    Although eyewitness testimony was the only evidence presented against Reeves and the circumstances surrounding the shooting made reliable identification difficult, it was not unsound for trial counsel to not present an expert on eyewitness identification. Generally, decisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy and reserved to the discretion of trial counsel. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence and are generally immune from claims of ineffective assistance of counsel. *Id*. Further, trial counsel's "failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion." *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). We acknowledge that Dr. Loftus' testimony may have improved the defense but cannot find trial counsel's decision not to present an eyewitness identification expert resulted in a failure to conduct a meaningful adversarial testing, especially considering trial counsel's thorough cross-examination of all four eyewitnesses. Therefore, counsel's performance was not deficient, and defendant failed to satisfy the first prong of *Strickland*.

¶ 41    Even assuming trial counsel's performance was deficient, there was no resulting prejudice from that deficient performance. To establish prejudice a defendant must show that but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

¶ 42    *People v. Popoca*, 245 Ill. App. 3d 948 (1993) is distinguishable. In *Popoca*, the defendant was found guilty of the attempted murder of his wife and daughter. *Id*. at 949. Trial counsel

presented the defense of voluntary intoxication and argued the defendant was too drunk to have a specific intent to kill. *Id.* at 951. However, counsel did not call an expert witness to support the intoxication defense because she believed there was sufficient factual evidence to show the defendant could not have formed an intent to kill and that an expert would not have significantly helped the case. *Id.* at 954. After a post-conviction hearing, the circuit court denied the defendant's claim of ineffective assistance of counsel. *Id.* The appellate court reversed the circuit court's denial and held that trial counsel was ineffective by failing to present an expert where expert testimony "would have substantially improved defendant's claim given the strong evidence of defendant's intoxication already in the record." *Id.* at 957.

¶ 43       Unlike in *Popoca,* there is no external evidence to support Dr. Loftus' opinion that either Jefferson's, Bernaugh's, or White's identification of Reeves was not independent. All testified that they identified Reeves without consulting Garner's yearbook. Likewise, Garner testified that she never showed any witness her yearbook. The *Popoca* court also found trial counsel's presentation of the defendant's intoxication inadequate. *Id.* at 956. Specifically, the laboratory technician failed to properly explain the defendant's blood alcohol level and its effect on his mental abilities where a psychological expert could have testified that his level of mental impairment was extreme. *Id.* Essentially, trial counsel in *Popoca* failed to present the relevant issues that an expert would have presented. Here, trial counsel not only discussed the same factors to which Dr. Loftus would have testified, but also used similar language.

¶ 44       At the conclusion of the evidentiary hearing, Judge Rickey Jones, who was the same trier of fact at Reeves' bench trial, found that Dr. Loftus' testimony would not change the court's findings. Dr. Loftus could not determine that either eyewitness was mistaken or dishonest in

15

their testimony. Additionally, Dr. Loftus acknowledged that the factors surrounding the shooting and witness identifications affected the weight given to a witness's testimony, which is an issue for the trier of fact to determine. After an evidentiary hearing, we afford great deference to the circuit court's assessment of a witness's credibility and findings of fact because "the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Richardson*, 234 Ill.2d 233, 251 (2009). However, we will reverse the circuit court where its findings are against the manifest weight of the evidence. Here, we find that the circuit court's rejection of Reeves' claim of ineffective assistance of counsel was not manifestly erroneous. Therefore, the circuit court's denial of the post-conviction petition is affirmed.

¶ 45                                   CONCLUSION

¶ 46          For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 47          Affirmed.